## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

BLAKE CRETACCI,          )
                            )

       *Plaintiff*,       )

v.                         )      Case No. 4:16-cv-97-CHS
                            )

JOE CALL, BRIAN KEITH, JARED  )
NELSON, JESSE HARDEN, CODY  )
FAUST, and COFFEE COUNTY,    )
                            )

       *Defendants*.     )

## MEMORANDUM OPINION

### I.    Introduction.

Defendants, Coffee County Deputies Joe Call, Brian Keith, Jared Nelson, Cody Faust and Coffee County, move for summary judgment [Doc. 67] in this action brought by Plaintiff Blake Cretacci pursuant to 42 U.S.C. § 1983 for alleged constitutional violations while Plaintiff was a pretrial detainee in the Coffee County jail. For the reasons stated herein, Defendants' Motion for Summary Judgment shall be **GRANTED**.

### II.    Background

#### A.    Facts

When reviewing a motion for summary judgment, the Court must consider the facts in the light most favorable to the nonmoving party who is, in this case, Plaintiff Cretacci. *See Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997). This case arises from incidents occurring on three separate days—September 29, 2015, October 11, 2015, and January 14, 2017—while Plaintiff was incarcerated at the Coffee County Jail as a pretrial detainee.

## 1.     September 29, 2015, Incident

On September 29, 2015, while Plaintiff was incarcerated in BC pod at the Coffee County jail, some inmates decided to hold a "peaceful riot" to protest conditions at the jail. Defendants have submitted two videos of this incident which provide a view of the pod. Based on that video, the Court makes the following observations about the pod:

- The pod is one large room, referred to as the dayroom, with a two-story ceiling.

- Round tables with fixed seats are situated in the dayroom. The rear area of the pod consists of two stories of individual cells running the length of the room (the cell wall).

- The cells have solid doors except for a long, very narrow rectangular window in each cell door.

- On the first floor, the cell doors open into the dayroom where the tables are located.

- On the upper level, the cell doors open onto a concrete balcony with a metal railing running the length of the second story cell wall. An inmate standing on the second story balcony can look down into the dayroom.

[*See* DVD videos of riot—Notice of Manual Filing, Doc. 47]

The "riot" involved the inmates' refusal to return to their cells for lockdown when instructed. [Doc. 68-7, Cretacci Dep. at 41]. There were three ring leaders of this "riot": Jeremy Mathis, BJ Murray, and Josh Byford. [*Id.* at 47]. They told the other inmates that, if they refused to participate in the riot, they would get beaten-up later. [*Id.* at 54-56]. Because Plaintiff took this threat seriously, he did not return to his cell when the guards instructed them it was time for lock up. [*Id.*]. Some of the inmates (not Plaintiff) put soap, clothes and other items on the floor in front of the main entrance door to the pod to impede the officers when they attempted to enter the pod. [*See* DVD videos]. Some inmates hung sheets on the railing of the second-floor balcony to stop pepperballs that the guards might fire at the inmates [*Id.*]. For the approximate two hour duration

of the "riot," Plaintiff sat at a table or walked slowly around the dayroom. [*Id.*]. Because he had closed his cell door earlier, he needed a guard's assistance to reopen it. [Doc. 68-7, Cretacci Dep. at 52]. At some point, he attempted unsuccessfully to signal surreptitiously to the guards to unlock his cell so that he could return to it. [*Id.*at 52, 55-56]. After about two hours, guards burst into the dayroom from doors on either side of the dayroom. [*See* DVD videos]. Some were carrying pepperball launchers. [*Id.*]. The guards ordered the inmates to lie on the floor, and the inmates complied within a minute or two. [*Id.*]. Plaintiff asserts that he did not resist, but that he was struck point-blank multiple times with pepperballs containing mace. [Doc. 68-7, Cretacci dep. at 42]. He further alleges that the guards beat other non-resisting inmates. [*Id.* at 42, 44-45, 73].

According to Plaintiff, after the inmates returned to their cells following the incident, the water in the sinks and toilets was turned off for two days and the toilets backed up. [Doc. 68-7, Cretacci dep. at 68-71]. The inmates were made to eat in their cells while being exposed to the fumes from human waste. [*Id.*]. They were also denied toilet paper. [*Id.* at 45-6]. They were not allowed to shower, and mace burned Cretacci's skin for at least a day. [*Id.* at 69-70].

## 2.    October 11, 2015, Incident

In his deposition testimony, Plaintiff stated that, following the riot on September 29, 2015, he notified the guards multiple times that he needed to be moved from BC pod; however, he made no written request and he could not remember names of specific guards whom he notified. [*Id.* at 48]. He also testified that he told guards that the rioting inmates were going to do bad things to people who did not participate in the riot, but he could not remember whom he told. [*Id.* at 117]. In response to a question about whether he had specifically told a Coffee County employee that he was concerned for his safety due to threats by Mathis, Murray, or Byford, Plaintiff answered,

> I wouldn't say that I'm afraid of these three people not knowing that they was [sic] out to get me, not knowing that they was—a fight was going to happen in the future. But I would have told these officers that this pod is crazy is what I kept saying.

> These people are nuts. I need to get out of this pod. You guys need to move me into another pod. These people are nuts. You've got to understand.

[*Id*. at 165].

Very early on the morning of October 11, 2015—before breakfast—the three ringleaders of the riot on September 29, 2015, Mathis, Murray, and Byford, were in the dayroom. Plaintiff left his cell to ask them to be quiet and then returned to his cell. [*Id*. at 79]. Plaintiff testified that the following event then occurred:

> Jeremy Mathis came into my cell and assaulted me, tried to swing, and I hit him out the door. And when I did that, the other two, Josh Byford and BJ Murray, were on the—helped him try to hit me. They—all three of them tried to push me back into the room, and I had fought my way out into the dayroom.
>
> And once we got out into the open area, I started to have more words with them, and the door opened up and officers came in. I immediately turned around and walked back to my cell. The officers came into the cell, secured me, locked the door, then left out in the dayroom, and they left the pod.

[*Id*. at 78-9].

When asked if he had spoken to the guards before going into his cell, Plaintiff testified that the guards asked him what was going on and he replied, "'I don't know what the **** is going on.' I remember saying that. I don't really know what—you know, it was pretty obvious what was happening, but I don't know why things were happening. I was confused about being hit." [*Id*. at 92]. Jesse Harden and Jared Nelson were two of the guards who came into the pod. [*Id*. at 91]. Plaintiff testified that the fighting had stopped before the guards came into the pod. [*Id*. at 92]. The guards then talked to Mathis, Murray, and Byford in the dayroom, but Plaintiff could not hear what they were saying. [*Id*. at 92-3]. Then the guards left the dayroom, and Mathis, Murray, and Byford threatened to kill Plaintiff. [*Id*. at 93]. Plaintiff did not call the guards on the intercom to tell the guards about the threats. [*Id*. at 94].

About a half hour later, breakfast was served. [*Id*. at 79]. Plaintiff testified:

I walked from my cell and got in line. I grabbed my tray and walked to a table and set my tray down. I walked back to the cell to grab my spoon to eat breakfast. When I walked into the cell, Jeremy Mathis was walking behind me. And when I walked into my cell and grabbed my spoon and my cup that was on the table, I turned around and he hit me, and I fell to the ground. He kept hitting me. And then he had his hands on my face and just started punching me more. He punched me for probably four or five times maybe, I would guess. After the first hit, I was out of it, because he hit me hard and I'm seeing black, that's why I fell.

When he left the room, I had gotten back up, but I was disoriented. And when I got out of the cell and went back to the table, I walked back to the table and I went to sit down, and I guess the officer had come up behind me, grabbed me, and put me up against the wall, 'cause I'm guessing that somebody was about to hit me again, which I didn't see. Then they took me out of the pod . . . .

[*Id*. at 79-80]. Officers Nelson, Keith, and Call were in the pod at that time. [*Id*. at 96; Call's Incident Report, Doc. 68-3, Page ID # 1089]. Officer Keith grabbed him and put him against the wall to keep him from being assaulted. [Cretacci dep. at 104-05]. Keith and Call then escorted Plaintiff "to medical" for evaluation. [Call's Incident Report, Doc. 68-3, Page ID # 1089]. In his incident report, Call described the commencement of the incident in the dayroom at breakfast as follows:

At approximately 0715, I, Deputy Joseph Call, was in BC pod serving breakfast with CO Nelson. As we completed and were leaving, CO Keith entered the pod. At this point, a verbal altercation began with inmates Mathis, Byford, Murray and Cretacci, regarding a conflict that started this morning around 0600.

[Call's Incident Report, Doc. 68-3, Page ID # 1089]. After Plaintiff was taken to medical for evaluation, he was permanently transferred to another pod for his protection and was not returned to BC pod. [Doc. 68-1,Gentry Aff. ¶ 16]. In his deposition, Officer Call explained that he learned Plaintiff, Mathis, Murray, and Byford had had a conflict at 6:00 a.m. by questioning Cretacci after they removed him from BC pod. [Doc. 68-10, Call dep. at 19].

### 3. January 14, 2017, Incident

Plaintiff asserts that, on January 14, 2017, he was sitting in the dayroom when Officer Cody Faust and several other officers rushed into the room. Then, without provocation, Faust shot him

two or three times with a pepperball launcher before he could comply with Faust's orders to get on the ground. According to Defendants, officers had heard over the intercom a discussion among the inmates about a plan to stab an unidentified inmate in the dayroom. [See Doc. 68-3, Incident Reports]. Faust initiated a search of the pod to prevent serious bodily injury or death. [Id.]. He ordered Officer Dubicki in the tower to make an announcement over the speakers in the dayroom instructing the inmates to lie on the ground on their stomachs. [Doc. 68-3, Incident Report, Page ID # 1085]. Faust heard Dubicki give the order. Then Dubicki notified Faust that some of the inmates were refusing the order. [*Id.*] At that point Faust and two other officers entered the pod with pepperball launchers.

In his deposition, Plaintiff described his view of the incident

I'm sitting at the table. I had my chess board out. I had my legs crossed. I'm waiting for the other player to come down to play. The pod door opens up and officers enter the pod, and the officers have pepperball guns and they stop at the front table, and everybody is looking around. The officers are looking around. The inmates are looking around, and everybody is questioning like, what the **** is going on, and why do you guys have guns? And there is [sic] two guys on the front table, sitting there, talking. And I'm just sitting there, and I'm looking, and they're talking to the guys at the front table. And Officer Faust breaks off and screams, "get on the ground." And he aimed his launcher right at me. (descriptive sound) shoots me, (descriptive sound) while I'm sitting there. And he's yelling, "get on the ground, " and I don't know, but I believe he shoots another inmate.

And as I get up, I get up off the stool that I'm sitting on, I get up, I turn around and I go to get down on the ground. I put my hands in front of me and I start to bend over, and he shoots me again, (descriptive sound). And I turn around and I said, quote don't ******* shoot me. Quit that ******* ****. There is nothing—I'm not even doing nothing."

And then I jump down on the ground. They go around and they search everybody. And everybody is, like, what the **** is going on? And then they go upstairs. They unlocked a room upstairs and grab them in and out, and they searched them. And then I believe they leave the pod . . . .

And then I asked for—I believe it was the other guy that got shot. I think he asked for the medical attention, to have somebody come down and look at us. And I don't believe we were actually looked at till the next day or the day after. It could have

been one or two days. But we did go to medical after a day or two, and they looked at our injuries, and put a graph on them to find out how big they were.

And then I don't know if they gave me Ibuprofen or not. And then that was the end of that.

[Cretacci dep. at 121-123].

Plaintiff clarified that Faust shot him once or twice in the arm with a pepperball when he was seated at a table while Faust was saying, "get on the ground" [*Id*. at 124-25]. After he was shot, he stood up and said, "dude, what are you doing, man? Why are you shooting me?" [*Id*. at 125]. Then he took off the poncho he was wearing because it made it difficult to get on the ground and turned around to get down when Faust shot him again in the back. [*Id*. at 125]. Plaintiff stood up again and said, "don't ******* shoot me again." [*Id*. at 126-27]. Then he hit the ground. [*Id*. at 127].

He did not hear the guard tower order the inmates to get on the ground before Faust entered the dayroom. [*Id*. at 128]. Nobody got on the ground until the guards entered the dayroom and started ordering them to get on the ground. [*Id*. at 128]. Plaintiff stated in his declaration that the "dayroom does not have a loudspeaker." [Doc. 70-2, Cretacci Decl. ¶ 5]. However, that statement was made in relation to the dayroom in BC pod where the October 11, 2015, incident occurred. [*See* Doc. 70-2, Cretacci Decl. ¶ 4 referencing the dayroom on October 11, 2015]. Plaintiff was moved out of that pod after the October 11, 2015, incident. [Doc. 68-1, Gentry Aff. ¶ 16]. The January 14, 2017, incident occurred in a different pod from the one referenced in Plaintiff's declaration.

## B.     Procedural History

### 1.     Plaintiff Mailed the Complaint to Be Filed

The original complaint in this case was mailed from the Coffee County jail and received by the United States District Court for the Eastern District of Tennessee on October 3, 2016. [Doc.

1]. At that time, Plaintiff's counsel, Drew Justice, was admitted to practice in the United States District Court for the Middle District of Tennessee; however, he was not admitted to practice in the Eastern District of Tennessee. [Doc. 70-1, Justice Aff. ¶ 3]. He mistakenly thought that Coffee County was in the Middle District and learned late on September 28, 2016, that it is in the Eastern District of Tennessee, Winchester Division. [*Id*. ¶ 4]. On September 29, he reviewed the rules to be admitted either permanently or pro hac vice but determined it would take more than one day to do either. [*Id*. ¶ 5]. Because he was not admitted to practice in the Eastern District, he could not file the complaint electronically. [*Id*. ¶ 8]. He then took the complaint to Plaintiff at the Coffee County Jail to sign. [*Id*. ¶ 6]. After getting the complaint signed, Mr. Justice took the signed complaint to the courthouse in Winchester, Tennessee, to file it manually, but there was no Clerk's Office located in the building. [*Id*. ¶ 10]. At that point, it was too late to take the complaint to Chattanooga to be filed because the Clerk's Office in Chattanooga would be closed by the time he arrived there. [*Id*. ¶ 10]. Mr. Justice then returned to the Coffee County Jail; gave Plaintiff an addressed envelope and postage; explained the prison mailbox rule; and told Plaintiff to mail the complaint. [*Id*. ¶ 11]. Mr. Justice assured him that "I would sign on to the case soon, once I got admitted to practice in East Tennessee." [*Id*. ¶ 6]. The Clerk's Office in Chattanooga received the complaint by mail on October 3, 2016. [Doc. 1]. Mr. Justice moved to be admitted to practice in this Court pro hac vice on November 22, 2016 [Doc. 3], and was admitted the following day [Doc. 4]. On March 11, 2017, Plaintiff amended his complaint to add Count IV which arises from the January 14, 2017, incident.

### 2. The District Court Dismissed QCHC, the Medical Provider at the Coffee County Jail

Plaintiff also sued QCHC, Inc., ("QCHC") a private medical provider with which Coffee County had contracted to provide medical services to the inmates at the Coffee County jail. In the

Amended Complaint, Plaintiff alleged that Coffee County delegated responsibility for all medical decisions to QCHC. [Doc. 18, Am. Compl. ¶ 4]. In Count I, Plaintiff brought a claim under 42 U.S.C. § 1983 against QCHC alleging that QCHC had acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment by the following conduct:

- During the September 29, 2015 riot, Plaintiff was shot twice in the face with two pepperballs filled with mace, and he was denied treatment.

- On October 11, 2015, Plaintiff was hit in the mouth by an inmate known to have HIV and some of the inmate's blood got into Plaintiff's mouth. He also sustained injuries to his face causing it to become swollen. QCHC refused to x-ray his face for three months to determine if it had been fractured and only gave him Ibuprofen.

- QCHC refused to provide him with any prophylactic treatment to prevent him from becoming infected with HIV despite knowledge of the attacker's HIV status. Further, QCHC did not perform an HIV test on Plaintiff until a week after the attack. Although the test was negative, the nurse who performed the test told Plaintiff the test was inconclusive because it had been performed so early. Plaintiff was finally given a second test after multiple requests ten months later and was told it was negative, but he was not given the test results.

Upon review of QCHC's Motion to Dismiss, the District Court found that QCHC's alleged conduct, assuming it to be true for purposes of the motion to dismiss, did not rise to the level of a constitutional violation, and the Court dismissed all claims against QCHC.[1] [Doc. 33, June 19, 2017, Memorandum and Order].

### 3. Plaintiff's Amended Complaint

Plaintiff asserts four counts in his Amended Complaint. All counts are brought under 42 U.S.C. § 1983 alleging various constitutional deprivations.

---

[1] Plaintiff did not bring a negligence claim against QCHC.

### a. Count I "Violation of the Right to be Free of Punishment Without Due Process of Law."

In Count I, Plaintiff brings claims arising from the October 11, 2015 assaults against

Defendants Call, Keith, Nelson, Harden and Coffee County asserting:

- Defendants failed to protect Plaintiff from violent assaults by other inmates on October 11, 2015, and were therefore "deliberately indifferent to the Plaintiff's health and safety" thereby violating his "Fourteenth Amendment right to be free of punishment without due process of law." [Am. Compl. 50].

- Coffee County is responsible for the acts of the individual defendants because they were acting according to "common jail custom." [Am. Compl. ¶ 51].

- Coffee County, as well as QCHC, acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Fourteenth Amendment. The factual basis for this claim against Coffee County is the same as the factual basis for this claim against QCHC which the District Court dismissed.

### b. Count II "Excessive Force."

In Count II, Plaintiffs brings claims arising from the September 29, 2015 riot against

Coffee County only, alleging that Coffee County violated his Fourteenth Amendment rights to be

free of excessive force and "to be free of punishment without due process of law" for the

following reasons:

- Coffee County engaged in "collective punishment against inmates." [Am. Compl. ¶ 62]. Collective punishment would include denying water and toilet paper for two days after the September 29, 2015, riot. [*Id*. ¶ 11].

- Coffee County officers assaulted Plaintiff with pepperballs and mace even though he was not resisting the officers when they entered the pod during the September 29, 2015 riot. [Am. Compl. ¶ 62].

- Coffee County is liable for its officer's conduct because Coffee County failed to properly train or supervise the officers, or the officers acted according to "improper policies." [Am. Compl. ¶ 62].

**c. Count III—"Violation of the Right to be Free of Punishment without Due Process of Law."**

In Count III, Plaintiff brings claims arising from the September 29, 2015, riot against only

Coffee County asserting that:

- [b]y failing to distribute essential supplies . . such as toilet paper and by disabling their water supply as a form of collective punishment, [after the September 29, 2015 riot] . . . Coffee County violated Plaintiff Cretacci's Eighth Amendment right to be free of cruel and unusual punishment." [Am. Compl. ¶ 64].

- Coffee County is a liable for its officers' conduct because the officers were acting according to a custom and "improper policies" and/or Coffee County failed to properly train or supervise the officers. [*Id.*].

**d. Count IV—"First Amendment Retaliation and Excessive Force"**

In Count IV, Plaintiff brings claims arising from the January 14, 2017, incident Officer

Cody Faust and Coffee County alleging that:

- Faust used excessive force in violation of the Fourteenth Amendment by shooting Plaintiff with a riot gun containing pepperballs without cause on January 14, 2017. [Am. Compl. ¶ 66].

- Coffee County is liable for Faust's conduct because he was acting according to Coffee County's custom or policy and Coffee County failed to properly train and/or supervise Faust.

- Faust shot Plaintiff with the pepperball launcher in retaliation for this pending lawsuit thereby violating Plaintiff's First Amendment rights.

In his response to Defendant's Motion for Summary Judgment, Plaintiff conceded he had

no proof supporting his First Amendment retaliation claim and withdrew it. [Doc. 69, Pl.'s br. at

18].

## III.    Discussion

### A.    Standard of Review

Fed. R. Civ. P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party may satisfy its burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-35 (1985); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). There are "no express or implied requirements in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim;" it is enough for the movant to "point[ ] out" an absence of evidence on an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 323-25; *see also Harvey v. Campbell Cnty, Tenn.*, 453 Fed. Appx. 557, 560 (May 10, 2011).

Once the moving party has fulfilled his initial burden under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to "go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324-25; *see also 60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *60 Ivy Street*, 822 F.2d at 1435-36.

### B.    Analysis

Section 1983 is a remedial statute which does not itself create independent, substantive legal rights. To make out a claim under 42 U.S.C. § 1983, the plaintiff is required to show that he has been deprived of a right, privilege, or immunity secured to him by the United States Constitution or other federal law and that the defendants caused the deprivation while they were acting under color of state law. *Gregory v. Shelby County, Tenn.*,220 F.3d 433, 441 (6th Cir. 2000); *Baker v. Hadley,*167 F.3d 1014, 1017 (6th Cir. 1999); *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir. 1997). In each of the Counts in his Amended Complaint, Plaintiff has alleged constitutional deprivations caused by state actors. There is no dispute that the defendants are state actors. The question before the Court is whether a constitutional deprivation occurred and, as to those claims arising from the riot on September 29, 2015, whether Plaintiff's claims are barred by the applicable statute of limitations. The Court will proceed in chronological order with respect to the events giving rise to the claims in this action rather than in numerical order of the Counts in the Amended Complaint.

### 1.    Counts II & III: Claims Arising from the September 29, 2015 Riot

Count II ("Excessive Force") and Count III ("Violation of the Right to be Free of Punishment without Due Process of Law") both arise out of the riot on September 29, 2015, and include conduct allegedly occurring for two days after September 29, 2015—possibly until October 1, 2015—i.e., shutting off water in the cells and denying inmates toilet paper.

Defendant seeks summary judgment as to Counts II and III on substantive and statute of limitations grounds. The Court will not reach the merits of Plaintiff's claims asserted in these Counts because they are barred by the applicable statute of limitations.

In an action under 42 U.S.C. § 1983, the Court applies the statute of limitations for a personal injury action under the law of the state in which the claim arises. *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, the limitations period is one year. Tenn. Code Ann § 28-3-104(a); *Eidson*, 510 F.3d at 634-35. Though the statute of limitations is borrowed from state law, "[t]he date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Id.* at 635. "Ordinarily, the limitation period starts to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.*

Plaintiff signed and delivered his complaint to prison officials for mailing on September 29, 2016, and it was filed by the Clerk of Court on October 3, 2016. [Doc. 2]. The Clerk's Office received the complaint on October 3, 2016. [Doc. 1].

The parties dispute what steps Plaintiff was required to take for the complaint to be deemed "filed" by September 29, 2016. Plaintiff contends he was an unrepresented prisoner and thus entitled to avail himself of the prison mailbox rule announced in *Houston v. Lack*, 487 U.S. 266, 108 S. Ct. 2379 (1988), making his Complaint timely because it was delivered to prison officials on September 29, 2016. Defendant argues Plaintiff was represented by his present counsel and thus required to file his complaint with the Clerk by September 29, 2016.

Initially, Defendant devotes significant attention to the "egregious fraud" allegedly perpetrated on the Court by Plaintiff's filing the Complaint "*pro se*" when he was in fact represented by counsel. Defendant insists this conduct was a misrepresentation to the Court, arguing that ghostwriting is "universally condemned" and worthy of sanctions. [Doc. 68 at 13].

Defendant suggests Justice delayed filing a notice of appearance to distance himself from Plaintiff's filing, noting the more lenient standard of review afforded to *pro se* litigants. [Doc. 68 at 14]. In the course of this *ad hominem* attack on Justice, Defendant mischaracterizes case law, cites inaccurately to an ethics opinion of the Tennessee Board of Professional Responsibility, and construes other authority quite liberally in its favor.[2] But Defendant's strenuous opposition misses the point. The question before the Court is simply whether Plaintiff was represented when he filed the Complaint and, if so, whether he was nonetheless permitted to file his Complaint by delivering it to a prison official for mailing.

Plaintiff argues he was unrepresented at the time of filing because his attorney was unable to represent him in the appropriate federal court. [Doc. 69 at 10]. Justice avers that he believed the appropriate district for filing was the United States District Court for the Middle District of Tennessee, in which he was admitted to practice. [Doc. 70-1 at ¶ 3]. He learned of his mistake the night before the statute of limitations expired but did not believe he could fulfill the requirements for *pro hac vice* or permanent admission on time. [*Id.* at ¶ 5]. Knowing he could not file electronically, he drove to the courthouse for the Winchester Division of the United States District Court for the Eastern District of Tennessee to attempt to file the Complaint in person. [*Id.* at 10]. When he arrived in Winchester, he discovered there is not a staffed Clerk's office at the courthouse.

---

[2] Defendant cites the fact section of Formal Ethics Opinion 2005-F-151 as though it were the guidance of the opinion itself. [Doc. 71 at 5]. The brief cites *Cook v. Stegall*, 295 F.3d 517 (6th Cir. 2002) and *Duhon v. Kemper*, 19 F. App'x 353 (6th Cir. 2001) for the proposition that "[a]pplication of the prison mailbox rule is narrow, and it does not serve to protect an incarcerated inmate from the negligence of his counsel." *Duhon* makes no such holding, finding only that the defendant waived his mailbox rule argument by failing to raise it at the trial level. Similarly, *Cook v. Stegall*, has nothing to do with negligence of counsel, relating instead to whether a complaint mailed to a third party can be deemed filed as of the date of mailing. Defendant cites *Redmond v. United States*, Case No. 4:13-cv-16, 2016 WL 9330497 (E.D. Tenn. Mar. 7, 2016) as holding that the prisoner could not use the mailbox rule because his declaration "failed to establish in any meaningful way how he had timely and properly used the prison mailing system." [Doc. 71 at 2]. In *Redmond*, the Court was applying Rule 3(d) of the Section 2255 Rules, which requires timely filing to be shown by a declaration or notarized statement that sets forth the date of deposit and states that first-class postage has been prepaid. *Redmond*, 2016 WL 9330497 at *4. In a § 1983 action, the Sixth Circuit has held that the "absent contrary evidence," courts assume the prisoner handed the complaint to prison officials for mailing on the date he or she signed the complaint. *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008).

[*Id.* at ¶ 10]. He did not believe he could make it to the Chattanooga Clerk's office before it closed, so he returned to the jail and instructed Plaintiff on how to file the Complaint. [*Id.* at ¶ 10, 11].

Justice's admission status and electronic filing capabilities in this District do not determine whether Plaintiff was represented at the time of filing. His legal representation of Plaintiff is clear from the fact that he drafted the Complaint, attempted to file it himself, and instructed Plaintiff on how to file it. [Doc. 70-1 at ¶¶ 4, 11]. When Plaintiff delivered the Complaint for mailing, he did so on the advice of his counsel. Plaintiff thus had the same benefit of counsel as any other represented litigant.

The Court finds that Plaintiff was represented by counsel. And, because Plaintiff was represented at the time of filing, the prisoner mailbox rule does not apply. Consequently, the Court finds that the Complaint was filed on October 3, 2015. In *Houston v. Lack*, the Supreme Court of the United States ruled that a *pro se* petitioner's notice of appeal on habeas corpus review would be deemed filed as of the date it was delivered to prison officials for mailing to the court. 487 U.S. 266 (1988). The Court observed that "[t]he situation of prisoners seeking to appeal without the aid of counsel is unique." *Id.* at 270. They are unable to monitor their notices of appeal to ensure they are timely filed and are instead forced "to entrust their appeals to the vagaries of the mail." *Id.* at 271. Incarcerated litigants can never really be sure that their filings will be filed on time, relying on prison officials "who may have every incentive to delay." *Id.* Accordingly, the Court held the appeal was timely "because the notice of appeal was filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Id.* at 276.

The United States Court of Appeals for the Sixth Circuit has extended this holding to, *inter alia*, "civil complaints filed by *pro se* petitioners incarcerated at the time of filing." *Richard v. Ray*, 290 F.3d 810, 813 (6th Cir. 2002); *see also Aldridge v. Gill*, 24 F. App'x 428 (6th Cir. 2001)

(mailbox rule of *Houston v. Lack* applies to § 1983 suits under applicable state statute of limitations). In *Richard v. Ray*, the Sixth Circuit reasoned that all of the circumstances cited by the Supreme Court in *Houston v. Lack* are also present when a *pro se* prisoner files a civil complaint. *Id.* The court has declined, however, to extend the rule to instances where the prisoner mails a pleading to a third party for filing. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). "The rationale for the rule is that the date the prisoner gives the petition to the prison can be readily ascertained, and any delays in receipt by the court can be attributed to the prison, and *pro se* litigants should not be penalized for a prison's failure to act promptly on their behalf." *Id.* at 521. In contrast, when a prisoner mails a complaint to a third party, the certainty facilitated by the rule is undermined. *Id.*

There is a circuit split as to whether the prison mailbox rule can be utilized by represented prisoners. The United States Court of Appeals for both the Fourth and Seventh Circuits have extended the rule to represented prisoners. *United States v. Craig*, 368 F.3d 738 (7th Cir. 2004) (represented prisoners may use the mailbox rule to file a notice of appeal that otherwise complies with Federal Rule of Appellate Procedure 4(c)); *United States v. Moore*, 24 F.3d 624, 625 (4th Cir. 1994) ("[T]here is little justification for limiting *Houston*'s applicability to situations where the prisoner is not represented by counsel."). The United States Court of Appeals for the Eight Circuit and the Ninth Circuit have each held that a represented prisoner may not take advantage of the rule. *Burgs v. Johnson County*, 79 F.3d 701 (8th Cir. 1996) (incarcerated plaintiff not entitled to benefit of *Houston* because he was represented by counsel); *Stillman v. LaMarque*, 319 F.3d 1199 (9th Cir. 2003) ("[T]o benefit from the mailbox rule, a prisoner must . . . be proceeding without assistance of counsel.").

The Sixth Circuit has not directly addressed this issue, but the court's prior holdings suggest it would restrict the rule's applicability to unrepresented prisoners. As announced in *Houston v. Lack*, the mailbox rule was not expressly restricted to prisoners proceeding *pro se*. Yet when the Sixth Circuit broadened the reach of the rule to include civil complaints, it limited that extension to prisoners without counsel. The court held: "*Houston v. Lack* applies to civil complaints filed by *pro se* petitioners incarcerated at the time of filing." *Richard v. Ray*, 290 F.3d at 813. To the extent *Richard v. Ray* reflects an extension of *Houston*, that extension was a narrow one and should be so construed.

The Sixth Circuit has also consistently focused on an inmate's lack of representation when discussing whether the prison mailbox rule applies in different contexts. *See Richard v. Ray*, 290 F.3d at 812-13 (*Houston* Court considered "several concerns particular to the incarcerated prisoner without counsel"); *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (mailbox rule exists because "*pro se* litigants should not be penalized for a prison's failure to act promptly on their behalf"); *Brand v. Motley*, 526 F.3d 921, 925 (2008) (mailbox rule creates a relaxed filing standard for "*pro se* prisoner's complaint"). The Sixth Circuit recently observed that the "mailbox rule exception is supported by important public policy considerations that are unique to unrepresented, incarcerated individuals . . . ." *United States v. Smotherman*, 838 F.3d 736, 737 (6th Cir. 2016). In *Smotherman*, the court wrote: "The prison mailbox rule has been long established, and we have recognized the typical rule that a *pro se* prisoner's notice of appeal is 'filed at the time [the *pro se* prisoner] delivered it to the prison authorities for forwarding to the clerk." *Id.* (*quoting Houston*, 487 U.S. at 276) (alteration in original).The Sixth Circuit's limited extension of *Houston v. Lack* to civil complaints filed by *pro se* prisoners, combined with its consistent articulation of the rule as

available to unrepresented inmates, suggests the court would decline to further extend the rule to a represented prisoner plaintiff.

It appears to the Court that Justice tried to find a practical solution to his mistake of venue, but that a confluence of obstacles prevented the timely filing of the Complaint. He could not file electronically in the Eastern District because he was not admitted to practice in this District and so could not register as an electronic filer. *See* United States District Court for the Eastern District of Tennessee Electronic Case Filing Rules and Procedures, Rule 5, *available at* https://www.tned.uscourts.gov/sites/tned/files/ecf_rules_procedures.pdf (last accessed March 20, 2020). He could have filed the Complaint in person at the Clerk's office for the Chattanooga Division of Eastern District, contemporaneously with an application for *pro hac vice* admission. Unfortunately, he instead tried to file in the Winchester Division, which does not have a staffed clerk's office and does not accept in-person, paper filings.[3]

Such a routine attorney error does not permit the Court to extend the statute of limitations. *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 561 (6th Cir. 2000) ("Absent compelling equitable considerations, a court should not extend limitations by even a single day."). As ever, an attorney is not required to wait until the final day of a limitations period to file pleadings. Because Plaintiff's Count II excessive force claim arose on September 29, 2015, and his Count III due process claims arose, at the latest, on October 1, 2015, his October 3, 2016, filing was untimely as to these claims. Consequently, Plaintiff's claims brought under Counts II and III are barred by the applicable statute of limitations.

---

[3] The Court's public website provides the following information regarding the Winchester Division under a link entitled, "Location and Information", "NOTICE: Any court filings in the Winchester Division should be mailed to the Chattanooga Divisional Office" *See* https://www.tned.uscourts.gov/winchester.

### 2. Count I: Claims Arising from the October 11, 2015 Assaults (Failure to Protect) and Deliberate Indifference to Serious Medical Needs

#### a. Failure to Protect

Plaintiff alleges in Count I of his Amended Complaint that Defendants Call, Keith, Nelson, and Harden failed to protect him from assaults by other inmates on October 11, 2015, and that this failure violated his "Fourteenth Amendment right to be free of punishment without due process of law." [Am. Compl. ¶ 50]. Plaintiff contends that Coffee County is liable for the individual defendants' failure because they were acting according to "common jail custom." [*Id*. ¶ 51].

"'[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners because corrections officers have 'stripped them of virtually every means of self-protection and foreclosed their access to outside aid.'" *Richko v. Wayne County, Michigan*, 819 F.3d 907, 915 (6th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). A pretrial detainee's claim for failure to protect is recognized under the Fourteenth Amendment and is analyzed using the same standard as the Eighth Amendment. *Richko*, 819 F.3d at 915; *see also Dickerson v. Ky Corr. Psychiatric Ctr*., No. 17-5412, 2017 WL 8792665, at * 2 (Oct. 12, 2017). The plaintiff bears the burden "to present[] evidence from which a reasonable juror could conclude that the individual defendants were deliberately indifferent to a substantial risk of serious harm to [the plaintiff] and that they disregarded that risk by failing to take reasonable measures to protect him." *Richko*, 819 F.3d at 916; (citing *Farmer*, 511 U.S. at 842). This rubric has both an objective and subjective component. *Richko*, 819 F.3d at 915, (citing *Farmer*, 511 U.S. at 835-38).

> [A plaintiff] can satisfy the objective component by showing that, absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm. The subjective component requires [the plaintiff] to show that (1) "the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner," (2) the official "did in fact draw the inference," and (3) the official then disregarded that risk. Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence.

*Richko*, 819 F.3d at 915-16 (citations omitted).

Defendants assert Plaintiff cannot prove the elements of a failure to protect claim because he can prove neither the objective nor the subjective components of the failure-to-protect analysis. [Doc. 68, Defs' br. at 22]. Since Plaintiff must present evidence to satisfy *both* components to defeat Defendants' motion for summary judgment, the Court will focus on Defendants' stronger argument, i.e., that Plaintiff has no evidence to support the subjective component. Plaintiff contends he does have evidence to show that the individual Defendants knew Mathis, Murray and Byford presented a substantial risk of serious harm to him:

- "Plaintiff asserts that records show Mathis, who committed the assaults on October 11, 2015, has shown a pattern of predatory behavior against other inmates, and has been brought up on disciplinary charges six times." [Doc. 69, Pl.'s br. at 15]. In support of this last contention regarding disciplinary charges, Plaintiff refers to Defendants' Response to Request for Production No. 5.

Defendants' Response to Request for Production No. 5 states, "[a]ttached is a DVD containing all responsive documents to this Request up to the date of June 7, 2017." [Doc. 70-6]. Insofar as it can tell, the Court does not have these documents. There is an exhibit attached to Plaintiff's brief entitled, "Case of Geremy Mathis: Disciplinary hearings" with a list of six "cases." [Doc. 70-5]. But this list provides no information regarding the type of disciplinary charges against Geremy Mathis. The list indicates one case was dismissed because Mathis was released from jail prior to the hearing. The remaining cases were dismissed because, "[f]ailed to follow policy—Did not have hearing in policy time frame." [Doc. 70-5]. Only two of the "cases" occurred before the October 15, 2015 assaults. [*Id.*] This information is not evidence that the Defendants would have known Mathis presented a substantial risk of serious harm to other inmates.

- Plaintiff stated in his deposition that he told guards that Mathis had threatened to beat up others who did not participate in the riot.

Plaintiff could not identify the guards, so it is unknown whether the guards he told were the individual Defendants in this case. Also, Plaintiff was a participant in the riot so he would not have been targeted by Mathis. Moreover, Plaintiff explicitly denied telling any guard prior to either of the assaults on October 11, 2015, that he was afraid of Mathis, Murray, and Byford. Rather, he told unidentified guards that the pod "was crazy" and he wanted to be moved. This information does not convey concern about one's safety.

- Plaintiff asserts Defendants knew Plaintiff and Mathis had been in an altercation on the morning of October 11, 2015.

The first assault on October 11, 2015, took place inside the cell. As previously mentioned, the cell has a solid door except for a very narrow window. There is no evidence that the officers could see inside the cell when the first assault happened. Plaintiff was able to push the attackers out of his cell where they continued to "have words." Call's incident report, which states he saw a verbal altercation, supports Plaintiff's own deposition testimony that once outside the cell, the altercation was verbal—not physical. The guards took reasonable action by asking Plaintiff what was going on, but Plaintiff did not tell them he had been assaulted or that he was afraid. He said he did not know what was going on. This interaction was not enough to apprise Defendants that Plaintiff was at substantial risk of serious harm. After the guards left the dayroom, Plaintiff did not use the intercom inside his cell to report his assault, not even after he heard Mathis, Murray, and Byford say they were going to kill him.

- Plaintiff was assaulted a second time on October 11, 2015.

As with the first assault, the second assault took place inside Plaintiff's cell and would not have been witnessed by guards outside the pod. Further, Plaintiff did not say he yelled for help while it was occurring, and he did not report the assault when he exited the cell and sat down at the table.

Moments later, before he could be hit again, Officer Keith grabbed him and placed him against the wall to protect him. At that point he was taken for a medical evaluation and removed to another pod.

Based on the evidence presented by Plaintiff, the Court concludes that Plaintiff cannot meet the subjective component of the applicable rubric. Plaintiff has presented no evidence that, prior to each assault on October 11, 2015: (1) the individual Defendants knew facts from which to infer Mathis, Murray, and Byford presented a substantial risk of serious harm to the Plaintiff; (2) the individuals Defendants did in fact draw the inference; and (3) the individual Defendants then disregarded that risk. Rather, the evidence presented by Plaintiff demonstrates that, when the officers finally understood that Mathis presented a physical threat to Plaintiff, they intervened, took Plaintiff for medical care, and removed him permanently from that pod.

Because there was no underlying constitutional violation, Plaintiff has no constitutional claim against Coffee County. *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 367 (6th Cir. 2017) ("Because no constitutional violations occurred, the district court properly granted summary judgment on Mr. Thomas's failure-to-train claim against the city and Chief Jacobs. For a municipality to be liable under 42 U.S.C. § 1983, a plaintiff must show harm 'caused by a constitutional violation.'"); s*ee also Murray v. Harriman City*, No. No. 3:07–CV–482, 2010 WL 546590, at *7 (E.D. Tenn., Feb. 10, 2010) ("the court has found that the arresting officers did not violate the plaintiff's civil rights; therefore, plaintiffs have not stated a viable claim for a § 1983 violation against the City of Harriman.") Therefore, Defendants are entitled to judgment as to Plaintiff's failure to protect claim asserted in Count I.

### b. Deliberate Indifference to Serious Medical Needs

Plaintiff also alleged in Count I of the Amended Complaint that Coffee County, as well as QCHC, had acted with deliberate indifference to his serious medical needs in violation of the

Fourteenth Amendment. The factual basis for this claim against Coffee County is the same as the factual basis for this claim against QCHC which was dismissed by the District Court. It is not clear to the Court that Plaintiff concedes he no longer has such a claim against Coffee County. Since the same factual conducts underpins both claims and the standard of constitutional analysis is the same for Coffee County as it was for QCHC, the District Court's decision dismissing Plaintiff's claim against QCHC applies equally to the medical needs claim against Coffee County. *See e.g., Whiteside v. Duke*, 2019 WL 2578260, at *4 (W.D. Tenn. 2019) (the court applied the same constitutional standard for a medical care claim to a private entity providing health care in a prison as it would to a municipality.) *See also Johnson v. Corr. Corp. of Am.*, 26 F. App'x 386, 388 (6th Cir. 2001); *Eads v. State of Tenn.*, No. 1:18-cv-00042, 2018 WL 4283030, at *9 (M.D. Tenn. Sept. 7, 2018). Consequently, to the extent Plaintiff continues to assert it, the Court concludes the Fourteenth Amendment claim against Coffee County for deliberate indifference to serious medical needs lacks merit and shall be dismissed.

### 3. Count IV—Claim Arising from the Event on January 14, 2017

Plaintiff alleges Cody Faust used excessive force when shooting him with a pepperball launcher on January 14, 2017. The Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). To prevail on a Fourteenth Amendment excessive force claim, "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable. *Id*. The "objective reasonableness turns on the facts and circumstances of each particular case." *Id*. (citation omitted). The *Kingsley* Court articulated the factors a court must consider when evaluating such a claim:

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of

hindsight. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security

Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

Id. (internal citations omitted) (brackets original).

On January 14, 2017, guards heard—over the intercom in the pod where Plaintiff was located— some inmates saying they were going to stab someone. Concerned that someone was about to be seriously injured or killed, the guards assembled to make entry into the pod. The Tower ordered everyone in the pod to get down on the floor. Faust was advised that some inmates were refusing to follow the order.[4] From the perspective of a reasonable officer, use of the pepperball launcher was reasonable because:

- When Faust entered the pod, Plaintiff was still sitting at the table. A reasonable officer on the scene would have concluded that Plaintiff was refusing the prior order to get on the floor.

- Faust had a legitimate institutional interest to maintain order and protect other inmates. Someone in the pod had a shiv and intended to stab another inmate. Immediate compliance with the order to get down could prevent violence.

- Officers needed the inmates on the floor to safely search for the shiv.

- A pepperball launcher is nonlethal force. Plaintiffs injuries were relatively minor—bruises that lasted a few days.

---

[4] Plaintiff stated in his declaration that the pod did not have loudspeakers, but this statement was made in relation to the pod in which he was incarcerated at the time of the October 11, 2015 assaults. [*See* Doc. Doc. 70-2, Cretacci Decl. ¶ 5]. He was moved to another pod permanently after the October 11, 2015 assaults.

- Use of a pepperball launcher allowed Faust to avoid dangerous direct contact with a noncompliant inmate who might have a shiv.

- Plaintiff continued to delay his compliance, standing up, talking back to Faust, turning around, trying to remove his poncho. Use of the pepperball launcher again was reasonable for the same reasons listed above.

- Once Plaintiff got on the ground, Faust did not shoot him again.

In other words, under the circumstances—given the information that Faust had at the time and the legitimate need to protect inmates from assault by another inmate with a deadly weapon—the force used by Faust against Plaintiff was not constitutionally excessive. Once again, because there was no underlying constitutional violation, Plaintiff has no constitutional claim against Coffee County. *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 367 (6th Cir. 2017). Faust and Coffee County are entitled to judgment as to Count IV.

## IV. Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**. Plaintiff's action shall be dismissed in its entirety and a judgment entered in favor of Defendants.

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE